**SOUTHWEST AEROSPACE CORPORATION, a California corporation, Plaintiff,**

v.

**TELEDYNE INDUSTRIES, INC., a California corporation, and its DIVISION TELEDYNE BROWN ENGINEERING, Defendant.**

Civ. No. 88–HM–5425–NE.

United States District Court, N.D. Alabama, Northeastern Division.

Dec. 5, 1988.

872

Wm. B. Hairston, III, Engel, Hairston & Johanson, P.C., Birmingham, Ala., Kit M. Stetina and Bruce B. Brunda, Stetina & Brunda, Laguna Hills, Cal., for plaintiff.

J. Ross Forman, III, Burr & Forman, Birmingham, Ala., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

HALTOM, District Judge.

On September 22, 1988 Plaintiff SOUTHWEST AEROSPACE CORPORATION (Southwest), a California corporation having its principal place of business in Santa Ana, California, filed the above entitled civil action against Defendant TELEDYNE INDUSTRIES, INC., a California corporation and its division, TELEDYNE BROWN ENGINEERING[1] (collectively Teledyne), alleging in Count One that Teledyne had infringed and was continuing to infringe Southwest's United States Letters Patent No. 4,770,368 for Turbine/Air Vent Reeling Machine (the '368 Patent) duly issued on September 13, 1988 by making, using and selling certain turbine/air vent reeling machines embodying the patented invention and was actively inducing infringement by obtaining customer and development markets for present and future infringement activities. The complaint alleges upon information and belief that Teledyne's specified infringement occurred within this judicial district, had been willful, and that by reason of the referenced infringement, inducement to infringement, and continued infringement by Teledyne, Southwest has been and will continue to be seriously damaged and irreparably injured.

Count One of the complaint prays for the following relief: [1] for a Preliminary and Permanent Injunction against Teledyne enjoining and restraining further infringement of United States Letters Patent No. 4,770,368 by Teledyne, its officers, agents, divisions, servants, employees and others controlled directly or indirectly by defendant; [2] for Plaintiff's reasonable attorney's fees, [3] for assessment of costs against Teledyne; and [4] for such other and further relief as may be required and appropriate in the discretion of the Court.

Count Two of the Southwest complaint realleges the factual allegations of Count One, demands judgment against Teledyne for such damages adequate to compensate Southwest for the past infringement of United States Letters Patent No. 4,770,368 and prays that such damages be trebled due to willful infringement by Teledyne

1. Teledyne Brown Engineering has a principal place of business at 300 Sparkman Drive, Huntsville, Alabama.

and for reasonable attorneys fees and costs of court.

On October 3, 1988 Southwest filed herein Application For Temporary Restraining Order (TRO) and Preliminary Injunction,[2] together with certain declarations and documentary evidence in support thereof. On that date the Court caused Teledyne's legal counsel in Birmingham, Alabama to be orally notified that the Court would hear the Southwest TRO application the following day at an hour certain at the Federal Courthouse in Huntsville, Alabama. On October 6, 1988 in the early portion of the afternoon of that day the Court met with counsel of record for Southwest and with legal counsel for Teledyne in the judicial chambers at the Federal Courthouse in Huntsville and heard brief statements in support of and in opposition to the TRO. All TRO proceedings were conducted of record. Upon consideration of the TRO application, the evidentiary matter offered in support thereof and the oral statements and arguments of counsel and applicable law, the Court by Order entered herein on October 6, 1988 denied the Application For Temporary Restraining Order filed by Southwest without opinion, noting therein that a separate order would be entered setting Southwest's Application for Preliminary Injunction in the above entitled civil action on an expedited basis.

By separate order entered herein on October 6, 1988 the Court with prior knowledge and consent of counsel of record for Southwest and of legal counsel for Teledyne set the application of Southwest for issuance of Preliminary Injunction against Teledyne in this civil action for hearing on October 24, 1988, commencing at 9:30 a.m. in the courtroom of the Federal Courthouse in Huntsville, Alabama providing therein certain requirements respecting evidentiary matter to be offered in support thereof and in opposition thereto at the hearing and a briefing schedule.

On October 21, 1988 defendant Teledyne filed herein its answer to the complaint of Southwest in this case admitting the issuance of the patent in suit, denying certain material allegations of the complaint, denying that the patent in suit was duly and lawfully issued, denying that it is guilty of willful infringement, alleging that the patent in suit is unenforceable, alleging that the patent in suit is invalid for the reason that it does not describe or claim anything new and useful as required by 35 U.S.C. § 101 and further alleging that the patent in suit is invalid in that the requirements set forth in 35 U.S.C. §§ 102, 103 and 112 are not satisfied. Moreover, Teledyne asserted two counterclaims for declaratory judgment against Southwest. Count One thereof is a counterclaim for declaratory judgment that the patent in suit is invalid for reason that [1] it does not describe or claim anything new or useful as required by 35 U.S.C. § 101; and [2] that the conditions set forth in 35 U.S.C. §§ 102, 103 and 112 for patent ability are not satisfied. The Count One counterclaim prayer for relief prays that: [1] the patent in suit is invalid and unenforceable; [2] that Teledyne has not infringed any valid patent; [3] that Teledyne be awarded its costs and reasonable attorney's fees; and [4] that Teledyne be awarded such other relief that the Court may deem proper.

Count Two of Teledyne's counterclaim alleges that the invention described in U.S. Patent No. 4770368 was described in a printed publication in this country and/or was in public use or on sale in this country more than one year prior to March 12,

---

**2.** The application of Southwest for TRO and for Preliminary Injunction seek the same injunctive relief but for different periods. The injunctive relief sought is as follows: (A) Making, using, selling or transporting any turbine air vent reeling machines designated under Purchase Order No. N889/304P11297GAA or related contracts; (B) Making, using, selling or transporting turbine air vent reeling machines heretofore sold an/or referred to by TBE and/or SAC by the product designation RMK–35; (C) Shipping or causing to be shipped to any destination outside of the United States any turbine air vent reeling machine which is substantially similar to the turbine air vent reeling machines heretofore sold and/or referred to by TBE and/or SAC by product designation RMK–35; (D) Specifically, continuing to manufacture and/or assemble any RMK–35 turbine air vent reeling machine(s), or parts thereof, for delivery to the Japanese Air Self Defense Force under Purchase Order No. N889/304P11297GAA.

1985, the date of filing the application for such patent; Southwest was aware that the invention described as Patent No. 4770368 had been described in a printed publication and/or was in public use or on sale in this country more than one year prior to the date of filing the application for the patent in suit yet Southwest failed to disclose such facts to the United States Patent and Trademark Office; Southwest violated the duty of candor and good faith toward the Patent and Trademark Office imposed by 37 C.F.R. § 1.56 by failing to advise the Office that the invention asserted in the patent had been incorporated in a finished product being offered for sale prior to March 12, 1984; Southwest willfully and intentionally failed to disclose the fact that the invention described in the patent in suit had been described in a printed publication and/or was in public use or on sale in this country more than one year prior to the date of filing the application for such patent ... the withholding of such information worked a fraud on the Patent and Trademark Office; Southwest's violation of the duty of disclosure was through bad faith or gross negligence which serves to render the patent unenforceable; that Southwest made known false misrepresentations to the Patent and Trademark Office which were the proximate cause of the Patent and Trademark Office issuing to Southwest the patent in suit; and that such misrepresentations serve to render the patent in suit unenforceable and has proximately caused Teledyne injury and damage. Teledyne's Count Two counterclaim prayer for relief prays that the Court will enter a judgment: (a) that Southwest has worked a fraud on the United States Patent and Trademark Office; (b) that Southwest has violated its duty of candor and good faith; (c) that the patent in suit is invalid and not enforceable; (d) that Teledyne recover costs and attorney's fees in this action; (e) that Teledyne be awarded such other damages as proven at trial; and (f) that Teledyne be awarded such other relief as the Court may deem proper.

The hearing of the Application of Southwest for Preliminary Injunction in this case was held on October 24, 25 and 26, 1988 in the court room of the Federal Courthouse in Huntsville, Alabama. The Court received numerous declarations and exhibits in support of and in opposition to Southwest's Application for Preliminary Injunction and also received live testimony from John Yates and Roger Brown (for Southwest) and from Carroll Johnson, Dave McClellan and E.R. Andrzejewski (for Teledyne). Appearing of record for Southwest: Attorney Bruce B. Brunda of the law firm of Stetina & Brunda (Laguna Hills, California) pro hac vice; and Attorney William B. Hairston, III of the law firm of Engel, Hairston, Johanson, P.A., Birmingham, Alabama. Appearing of record for Teledyne: Attorney J. Ross Forman, III of the law firm of Burr and Forman, Birmingham, Alabama; and Attorneys John T. Roberts and Robert G. Weilacher of Beneridge, DeGrandi & Weilacher (Washington D.C.) pro hac vice. The Court heard oral arguments of counsel at the close of presentation of evidence. At the conclusion of such hearing the Court orally announced of record that the Application of Southwest for issuance of Preliminary Injunction as prayed for would be granted with exception that Teledyne would not be enjoined or restrained by the Court from completing its contract with YAMADA INTERNATIONAL CORPORATION (Yamada), Yamada Purchase Order dated January 28, 1988, No. 889/304P11297GAA, for the manufacture and/or assembling of RMK–35 turbine air vent reeling machines or parts thereof for delivery by Yamada to the Japanese Air Self Defense Force, it being the finding and determination of the Court that monetary damages to Southwest for the injuries and/or damages allegedly caused it by this particular alleged infringement by Teledyne, if such alleged infringement were proved by a preponderance of the evidence at trial, would adequately compensate Southwest with respect to the injury or injuries thereby allegedly sustained by it for this particular alleged patent infringement. The Court further orally ruled of record that Southwest was required as a condition of the issuance of the Preliminary Injunction to file Bond in principal amount of $100,000.00 with corporate surety there-

on and conditioned as required by law. The Court thereupon and of record directed counsel of record for plaintiff Southwest to submit to the Court proposed findings of fact and conclusions of law in this case within ten (10) days and that upon receipt thereof counsel of record for Teledyne was granted ten (10) days within which to submit to the Court its reply findings of fact and conclusions of law herein. In conformity with such directives counsel of record for Southwest and Teledyne thereafter made their respective submission.

In conformity with the provisions of Rule 52, Fed.R.Civ.P., and on the basis of the evidentiary record of the hearing on Southwest's Application for Preliminary Injunction, and pending final hearing, the Court now finds the facts specially and states separately its conclusions of law thereon.

## FINDINGS OF FACT

1. Plaintiff Southwest Aerospace Corporation ("Southwest") is a California corporation having its principal place of business at 1919 S. Susan Street, Santa Ana, California.

2. Defendant Teledyne Industries (Teledyne) is a California corporation whose division, Teledyne Brown Engineering, has its principal place of business at 300 Sparkman Drive, Huntsville, Alabama.

3. On September 13, 1988, the United States Patent and Trademark Office issued U.S. Patent No. 4,770,368 for a Turbine/Air Vent Reeling Machine (the '368 Patent).

4. On September 22, 1988, Southwest filed its complaint in this Court alleging that Teledyne infringed the '368 Patent in the course of manufacturing and marketing certain equipment utilized for the deployment and towing of aerial gunnery targets, such as those disclosed in the '368 patent.

5. On October 21, 1988, Teledyne answered the complaint denying the allegations of infringement and raising an affirmative defense of patent invalidity, including the "on sale" bar of 35 U.S.C. § 102(b), "obviousness" under 35 U.S.C. § 103, and inequitable conduct and fraud on the United States Patent and Trademark Office.

6. The '368 Patent is based on a patent application filed with the United States Patent and Trademark Office on March 12, 1985. Thus, the critical date as far as the "on sale" bar is concerned is March 12, 1984.

7. All rights to the invention of the '368 Patent were assigned to Southwest in an assignment dated March 11, 1985 and recorded in the United States Patent and Trademark Office on March 12, 1988 at Reel Number 4387 and Frame Number 289.

8. The invention disclosed and claimed in the '368 Patent is directed to a turbine air vent reeling machine utilized for deployment and towing of aerial gunnery targets. The turbine air vent design utilizes the wind stream impinging upon the moving aircraft for purposes of driving and braking the operation of a reeling machine during target payout and payin, i.e., during deployment and recovery of the towed target. Variable opening vents are moved between open and closed positions by a servo mechanism. The movement of the vents regulates the air flow through the housing and, consequently, regulates the rotational speed of the ram air turbine. The rate at which the target is deployed and recovered varies directly with turbine speed, which is preferably maintained at a substantially constant rate.

9. The reeling machine includes a control circuit for regulating turbine speed. The control circuit includes a tachometer which generates an output signal representative of turbine speed. The tachometer output signal is introduced into a closed loop control circuit which compares the tachometer output signal to a preselected set point voltage corresponding to the desired rotational speed of the turbine. Differences between the desired and actual tachometer voltage, and related derivative and integral values with respect to time, are mixed and amplified to drive the servo mechanism to adjust the vent opening, thereby increasing or decreasing the turbine rotational speed. The derivative func-

tion aids in speed control by, in effect, accentuating the response of the circuit to deviation between actual and desired speeds. The integral function further aids in speed control by reducing the susceptibility of the circuit to various types of noise as may be found in a military environment.

10. The first turbine/air vent reeling machine developed by the inventors and manufactured by the plaintiff's predecessor, PDA Engineering, was designated as RM-60. The RM-60 was used for deployment of aerial gunnery targets and operated mechanically the same way as the turbine air vent reeling machine set forth in the '368 Patent. The RM-60 had an over-center locking configuration to resist airflow forces exerted on the vents, and had a means for controlling surging and seeking of the servo mechanism. (Yates Depo. at pp. 44-46, 57).

11. Construction of the RM-60 began in 1978 or 1979 and the first sale of an RM-60 took place in 1979. (Yates Depo. pp. 49, 52-54).

12. The RM-60 was flight tested by the United States Air Force at the time of sale, and only minor modifications were made to the RM-60 as a result of these tests. (Yates Depo. pp. 54-56).

13. The next turbine/air vent reeling machine manufactured by plaintiff or its predecessor was designated the RM-30. The RM-30 was smaller than the RM-60, but was similar in operation to the turbine/air vent reeling machine set forth in the '368 Patent which became known as the RMK-35. (Yates Depo. pp. 46-47, 58).

14. The RM-30 had an over-center locking configuration to resist air flow forces exerted on the air vents similar to the configuration that is found in the RMK-35 and had a mechanical means of operating the vents to control surging and seeking speed response similar to the RMK-35. (Yates Depo. pp. 46-47, 116-131).

15. The RM-30 also had an electronic processing means for controlling surging and seeking of the servo-motor. (Yates Depo. p. 127).

16. Six RM-30s were ordered by the Finnish Air Force in 1981, and were delivered in approximately September, 1982. (Yates Depo. p. 44).

17. Prior to delivering the RM-30 to the Finnish Air Force in September, 1982, the reeling machine went through flight tests on a Lear Jet 35A. No major modifications were made to the RM-30 following the flight test. (Yates Depo. pp. 59-60).

18. In the fall of 1982, Southwest through its predecessor PDA demonstrated the RM-30 for the United States Air Force by subjecting it to flight tests on a F-106 and F-15. (Yates Depo. p. 68).

19. The RM-30 performed suitably during the flight test conducted by the United States Air Force until it suffered structural damage at the end of the test program. (Yates Depo. pp. 68-69).

20. Prior to 1983, Teledyne contracted with the United States Air Force to provide an aerial gunnery target system for use by the United States Air Force, i.e., prime contract number F08635-80-C-0176. Teledyne had previously obtained a license from a French manufacturer to utilize its technology in the production of an aerial gunnery target system which was supplied to the Air Force under that contract. That particular Teledyne aerial gunnery target system, produced under license from a French manufacturer, was non-recoverable after use, i.e., it was incapable of being payed back into the towed aircraft, and therefore had to be jettisoned by the towing aircraft after use. The lack of a mechanism to recover the target effectively precluded use of the Teledyne aerial gunnery target system in certain environments, e.g., in over-water environments where it was desirable to conduct training missions.

21. Shortly after Southwest's demonstration of the RM-30 machine the United States Air Force directed Teledyne to issue an engineering change proposal (ECP25) to the existing prime contract between the Air Force and Teledyne (i.e., a change to prime contract number F08635-80-C-0176), and to procure from Southwest an initial order of three RM-30 turbine air vent reeling machines and numerous aerial gunnery tar-

gets for first article demonstration to the Air Force.

22. The reason why the Air Force chose to procure the RM–30s through Teledyne, rather than directly from Southwest, appears to have been related to difficulties associated with entering into new contracts at that time. By procuring the RM–30s through Teledyne the Air Force could utilize an existing contract relating to similar types of products.

23. In April, 1983, after ECP25 was entered, Teledyne entered into a subcontract agreement with Southwest for the procurement and delivery of the initial three RM–30 turbine air vent reeling machines and 62 aerial gunnery targets, from Southwest pursuant to subcontract number SC7059. As part of that subcontract, SC7059, Teledyne and Southwest consented to a Memorandum of Agreement under which, inter alia, provided as follows:

2. The parties agree that all data furnished or exchanged hereunder or in the performance of this agreement regarding the proposal for Reel In/Out Tow Sets TP–5870–00 shall be deemed proprietary to Southwest and Teledyne agrees, except as is provided in paragraph number 1. above, that it shall not, without the prior written permission of Southwest, disclose or use any data or information acquired hereunder. Except to the U.S. government, Teledyne will not, directly or indirectly impart, reveal to any person or entity any information or data pertaining to the Tow Set design, including without limitation, information pertaining to designs, formulas, processes, methods, apparatus, devices, compositions, inventions and the like.

24. At about that time Southwest determined that the RM–30 turbine air vent reeling machine was encountering certain problems relating to the lack of adequate means to control the rotational speed of the turbine within acceptable limits, particularly in a military environment wherein substantial intensive radiated signal levels were encountered. While the Southwest subcontract with Teledyne, subcontract SC7059, called for the RM–30 system, it also incorporated by reference certain environmental performance requirements, e.g., reduced susceptibility to electromagnetic interference, which the RM–30 could not meet. In response to those requirements the patentees, both employees of Southwest, developed an improved reeling machine designated the RMK–35. Southwest ultimately delivered the RMK–35 system to Teledyne in satisfaction of its obligations under the subcontract. First delivery of an RMK–35 system by Southwest to Teledyne took place in April 1984.

25. As set forth in the Declaration and Testimony of co-inventor Roger Brum the control circuit of the earlier RM–30 reeling machine included a differentiator circuit that operated to regulate the operation of the vents and thereby the rotational speed of the turbine. However, the speed control provided by the RM–30 differentiator circuit was course in that it did not respond to speed increases and decreases until they exceeded a significant threshold. Moreover, the RM–30 exhibited undesirable response to signals induced in the circuit as a consequence of electromagnetic interference. Consequently the RM–30 did not operate to maintain turbine speed within acceptable limits in a noise intensive environment.

26. The RM–30 circuit operation was characterized by a "dead band", meaning that changes in turbine speed would produce no response in the control circuit until those changes exceeded a certain threshold. The "dead band" had in part a favorable effect in that it somewhat reduced the susceptibility of the circuit to the effects of noise, but it also had unfavorable effects in that it limited the ability of the control circuit to course to avoid surges in rotational speed. As a consequence the RM–30 exhibited instability in that the turbine rotational speed would vary within the "dead zone", as measured by variations in the tachometer output voltage. Additionally, the existence of the "dead zone" resulted in higher current requirements for the servo mechanism in that the useful voltage level

was reduced by the threshold voltage level, thereby requiring higher current levels to satisfy system power requirements.

27. Consequently, the object of the development of the RMK–35 was to provide a reeling machine that could provide high turbine speed stability, even in a noise-intensive environment. The control circuit developed for the RMK–35, the commercial embodiment of the '368 Patent, provides selective damping of the noise signals while providing close control of turbine rotational speed.

28. The specification of the '368 Patent makes clear that the electronic control means set forth in Claim 1, i.e., the claimed "means for controlling the operation of said vent means to avoid undesirable surging and seeking speed response of said rotor about said desirable rotational speed," refers to circuitry that minimizes feed overshoot and oscillations in turbine speed (Col. 3, lines 35–37), while also reducing susceptibility to electromagnetic interference. The essence of the specified control means is set forth at Col. 3, lines 49–52, where it is stated:

> Due to this novel aspect of the control electronics of the present invention, such surging is eliminated whereby proper turbine rotational speed can be achieved even in electromagnetic interference environments.

29. The specified "means for controlling the operation of said vent means to avoid undesirable surging and seeking speed response of said rotor about said desired rotational speed," therefore, is directed to a circuit providing high rotational speed stability even in a noise intensive environment, i.e., electromagnetic interference environments. The improved control circuit of the RMK–30 circuit did not.

30. The high stability/noise damping circuit of the RMK–35 was conceived in August of 1983 well after EPC25 was issued and well after Teledyne and Southwest had entered into a subcontract SC7059. After conception in August of 1983 initial drawings were prepared to allow construction of a test prototype. Drawings of the RMK–35 control circuit were prepared during approximately September 1983 and were reported to Teledyne at approximately the same time.

31. The RMK–35 was developed over the course of the work performed by Southwest under SC7059. Construction of the first RMK–35 incorporating the improved control circuit took place during approximately January 1984. Delivery of the first RMK–35 to Teledyne took place in April 1984 (i.e., less than one year before the patent application filing date). In May 1984 the United States Air Force first received documentation illustrating the improved control circuit in the RMK–35. Delivery of the first RMK–35 to the United States Air Force took place in approximately June 1984.

32. Initial testing of the electrical control circuit of the RMK–35 continued from approximately September 1983 to March 1984. That testing demonstrated that the unshielded circuit was still susceptible to the undesirable effects of electromagnetic interference. Systems level tests of the RMK–35, with the improved control circuit incorporated therein, continued until approximately June 1984. Though the circuit and system tests checked susceptibility to noise, those tests did not check the ability of the new control circuitry to cooperate with the mechanical system to regulate turbine speed, i.e., to avoid undesirable surging and seeking, in the intended environment. Not until flight tests were conducted was it determined that the RMK–35 would adequately avoid undesirable surging and seeking of the reeling machine in its operative environment. The first flight tests of the RMK–35 took place in approximately June 1984. Until such flight tests were conducted and evaluated the design of the RMK–35 remained in substantial jeopardy.

33. In his testimony at the Hearing on this matter Co-inventor Brum indicated that during flight the reeling machine is subjected to multiple interacting aerodynamic and mechanical forces that are extremely difficult, if not impossible to accurately predict and evaluate in a theoretical sense. For example, he stated that the air

flow across the rotor and about the vent door varies with respect to air speed, wind speed and the position of the vent doors. He further testified that inertia of the cable spool, which may oppose rotation of the rotor, varies substantially as the cable is payed out and payed in. Also, the cable and target provide aerodynamic resistance which varies in response to factors such as the length of the deployed cable and the flight path.

34. According to Brum these and other aerodynamic and mechanical factors interact in the operation of the reeling machine and could not practically be predicated and evaluated in bench tests. Therefore, flight tests were essential in determining whether or not the RMK–35, including the improved control circuitry, would adequately perform its intended function in an operating environment.

35. Teledyne introduced the declaration and testimony of Dr. Carroll Johnson in support of its position that the '368 Patent is invalid. His testimony regarding the alleged obviousness of the invention is described below. However, Dr. Johnson's testimony concerning the need for flight testing to confirm the operation of the improved control circuit was supportive of Southwest's position. Dr. Johnson indicated that field testing was necessary in order to confirm that the circuit would properly perform in its intended environment. He further indicated that it would be irresponsible not to conduct such tests prior to concluding that such a circuit would operate as intended.

36. Southwest completed all of its requirements under subcontract SC7059 and delivered the required three turbine Air vent reeling machines (RMK–35s) and aerial gunnery targets to Teledyne.

37. Later in 1984, the United States Air Force entered into prime contract number FO8635–85–C–0031 with Teledyne for the procurement of an additional thirty (30) air vent reeling machines and an additional 467 aerial gunnery targets, to be manufactured by Southwest.

38. Shortly thereafter, Teledyne entered into government subcontract number SC7344 with Southwest for the procurement of the additional 30 turbine air vent reeling machines and 467 aerial gunnery targets to be manufactured by Southwest.

39. Subsequent to subcontract SC7344 Southwest indicated an unwillingness to continue to sell the RMK–35 through Teledyne, preferring instead to sell directly to the U.S. Government. As a consequence of Southwest's position Teledyne sought to use drawings of the RMK–35, prepared by Southwest, to manufacture the RMK–35 in competition with Southwest. Southwest protested Teledyne's action to the U.S. Government and brought an action against Teledyne in the California Superior Court. The U.S. Government subsequently acknowledged that certain of the RMK–35 drawings were proprietary to Southwest and the California Superior Court issued an injunction precluding Teledyne from using those drawings.

40. Teledyne then contracted with a third party engineering firm, Campbell Engineering, to provide detailed part drawings and manufacture portions of the RMK–35. Pursuant to that contract Teledyne provided Campbell Engineering with an actual production unit of the RMK–35, delivered to Teledyne by Southwest for the U.S. Air Force, and requested that Campbell Engineering reverse engineer the same to produce detailed production drawings.

41. As a consequence of its efforts, Teledyne procured from Campbell Engineering, production drawings and components of the RMK–35 which were identical reproductions of Southwest's RMK–35.

42. Upon obtaining knowledge of the impending issuance of the '368 Patent, Teledyne filed a formal protest under 37 C.F.R. § 1.291 in the United States Patent and Trademark Office approximately one week prior to the anticipated issuance of the '368 Patent. The protest filed by Teledyne alleged that the claimed invention was not patentable, and included the following specific allegations:

1. That the invention was in public use or on sale in this country, more than one year prior to the date of the

application for patent of the United States (35 U.S.C. § 103);

2. That the invention was described in a printed publication more than one year prior to the date of the application for patent (35 U.S.C. § 102(b)); and

3. There was improper named inventorship of the subject application (35 U.S.C. § 102(f)).

43. In support of its protest Teledyne submitted over one hundred sixty pages of documents illustrating and describing the structure and function of the RM–30. In response to Teledyne's protest Southwest filed opposition papers which erroneously asserted that the RMK–35 control circuit was not conceived until less than one year before the patent application filing date.

44. The Examiner was advised of the function and operation of the RM–30 mechanical structure and electrical control circuit. Cross-sectional drawings of the RM–30 were contained in exhibits submitted by Teledyne, as were statements describing the RM–30 control circuit.

45. Pursuant to the filing of the protest by Teledyne the '368 Patent was withdrawn from issuance to consider the merits of Teledyne allegations. Further, while the protest document did not explicitly raise questions of fraud or inequitable conduct before the Patent and Trademark Office under 37 C.F.R. § 1.56 the Patent and Trademark Office, the Patent and Trademark Office noted that such issues were implicitly raised by Teledyne's allegation that the applicant had failed to disclose to the Patent and Trademark Office information or material that was referenced in the protest, e.g., information concerning prior sales, prior publications and questions of inventorship. The application was then remanded to a senior Examiner, i.e., a Supervisory Primary Examiner (SPE), for examination of the issues (other than fraud) raised in the protest.

46. Various portions of the documents filed by Teledyne in support of the protest demonstrate that the SPE having responsibility for considering the protest was fully aware that the RM–30 had means for controlling the turbine speed. What the RM–30 did not have, and what the SPE found to be patentably distinct, was the construction of a tow reel incorporating the claimed control means providing stable turbine speed control even in a noise environment.

47. On November 20, 1987, after reviewing the materials presented by Teledyne, the SPE in charge of the subject application rendered his decision as to the allegations contained in Teledyne's protest, finding that there was:

(a) "no evidence in any of the exhibits presented by protestor that the subject matter of the present claims was on sale or in public use in this country more than one year before the filing of the subject application";

(b) that there was no evidence that the present invention was described in a printed publication more than one year prior to the filing for patent; and

(c) that there was no evidence provided that anyone other than applicant contributed to the invention as set forth in the claims.

As such the SPE determined that each of the allegations presented by TBE were unfounded.

48. As noted by the SPE in rejecting Teledyne's allegations of invalidity,

"the inventive subject matter of the patent application is nowhere described in any of the exhibits presented. Although the device upon which the present invention provides an improvement in apparently shown to have been on sale and in public use more than one year prior to the application, the improvement however is not shown to have been on sale or in use."

49. Following the determination by the SPE that Teledyne's protest was unfounded, the '368 Patent application was referred to the Office of the Assistant Commissioner of Patents for further consideration in regard to the fraud issues implicitly raised by Teledyne's protest, i.e., did the inventors fail to satisfy their duty of disclosure during the course of the prosecution of

the '368 Patent. On June 2, 1988 the Office of the Assistant Commissioner for Patents rendered a decision concluding that no violation of the inventors duty of disclosure had been shown.

50. On September 13, 1988 the '368 Patent was issued by the United States Patent and Trademark Office in the name of Southwest.

51. At the hearing on the Application for Preliminary Injunction, Teledyne admitted of record that, if valid, the claims of the '368 Patent had been and are being infringed by Teledyne.

52. At the Preliminary Injunction hearing and in its brief Teledyne argued that the claims of the '368 Patent are invalid under the "on sale" bar of 35 U.S.C. § 102(b) and were obvious under 35 U.S.C. § 103. Teledyne also argued that the '368 Patent is unenforceable in that it was procured as a consequence of inequitable and fraudulent conduct with respect to both the failure to disclose information concerning the RM–30 to the Patent Examiner and for misrepresenting to the Patent and Trademark Office that the claimed invention was not in existence prior to March 12, 1984.

53. It is clear from the evidentiary record that the RM–30 did not have the claimed control means to avoid undesirable surging and seeking as is set forth in Claim 1 and embodied in the RMK–35.

54. Insofar as technical experts of both parties have acknowledged the need for flight testing to confirm the suitability of the improved control circuit to avoid undesirable surging and seeking, this Court finds that the RMK–35 was not reduced to practice to the point that its usefulness for its intended practice was established until flight testing began in June of 1984, i.e., less than one year before the patent application filing date.

55. Teledyne argued that work done under SC7059 was in the nature of a production contract and therefore the RMK–35 was offered for sale in April 1983 when SC7059 was entered into. However, Teledyne's own documentation characterizes work done under SC7059 as developmental in nature and further indicates that the first production contract for the equipment in question was not awarded until January 1986.

56. Except for reports to Teledyne Southwest made no distribution of documents illustrating the RMK–35 control circuit prior to the critical date, i.e., March 12, 1984. Such documentation was not provided to the United States Air Force until April of 1985. Insofar as the Memorandum of Agreement between Southwest and Teledyne place Teledyne under a confidential obligation with respect to such documents, the communications between Southwest and Teledyne cannot be viewed as a publication under 35 U.S.C. § 102(b). Consequently, Southwest's activities in relation to the RMK–35 do not constitute prior art falling within the scope of any portion of 35 U.S.C. § 102(b).

57. Teledyne's testimony and evidence concerning the alleged obviousness of the claimed invention over the RM–30 system was not persuasive and was largely built around unsupported conclusions that proceeded from an assumption of the claimed invention.

58. Teledyne's principal technical expert was Dr. Carol Johnson, a college professor who has taught courses in control engineering for many years. He testified that the design of the RMK–35 control circuitry would have been obvious to one of ordinary skill in the art at the time of the invention. Dr. Johnston stated that control circuitry to avoid surging and seeking was well known and that the particular type of control circuit illustrated at Figures 9 and 10 of the Patent was known for many years before the patent application filing date.

59. Dr. Johnson testified that one of ordinary skill in the art of the relevant time would likely have been a person having an undergraduate degree in electrical or mechanical engineering, with two courses in electrical control systems. Dr. Johnson stated that in order to develop the RMK–35 one of ordinary skill in the art would have created a mathematical model of the reeling machine representing all the mechanical and aerodynamic forces acting upon it

in flight. He testified that certain assumptions with respect to the mathematical model could then be tested for criticality using well known mathematical techniques, e.g., the creation of Nyquist diagrams and application of the Routhe criteria. From that point he testified that one of ordinary skill could readily develop a transfer function representative of the operation of the system and select electrical circuitry suitable to implement that transfer function.

60. Southwest did not contest the ability of a skilled artisan to select electrical control circuitry to implement a given transfer function. However, Southwest argued that Dr. Johnson's testimony regarding the creation of a mathematical model to implement the invention was unsound and well beyond the level of ordinary skill in the art at the relevant time. Southwest further argued that Dr. Johnson's testimony regarding development of the specified transfer function and selection of the circuit arrangement illustrated in the '368 Patent represented a hindsight reconstruction of the claimed invention.

61. Dr. Johnson admitted that he had never actually tried to construct a mathematical model representative of the mechanical and aerodynamic forces acting on the RMK–35, nor could he identify anyone employed by the Teledyne who would be competent to construct such model. Prior to his testimony Dr. Johnson himself made no calculations, conducted no tests, and reviewed no data concerning the RMK–35 other than a review of the text of the '368 Patent. Accordingly, Dr. Johnson's testimony concerning what a skilled artisan might have been able to do years earlier is entitled to little weight and is given the weight it deserves.

62. In contrast to Dr. Johnson's testimony Co-inventor Brum credibly testified that despite over ten years experience with respect to aerial gunnery target systems and a doctorate in engineering, he could not sufficiently predict the interaction of the aerodynamic and mechanical forces cooperating in the reeling machine to ace control circuit from a mathematical perspective. Rather, he indicated that the derivation of the control circuit was as much a process of experimentation as of calculation. Brum indicated that his initial efforts to satisfy the low noise susceptibility requirements was to provide a low pass filter at the input of the differentiator circuit of the RM–30 control circuit. However, lab tests of that configuration demonstrated that it degraded the ability of the control circuit to maintain proper speed control. He later experimented with an integration circuit in a feedback path and made changes to the differentiator circuit such that the differentiator and integration circuits cooperated to provide optimum speed control and noise rejection. He experimentally and mathematically verified his models, ultimately changing every component in the relevant portion of the RM–30 control circuit and adding additional components to accomplish the desired functions. Brum further indicated that in view of the inability to mathematically model the various forces that interact in actual in-flight testing was necessary to confirm the design of the control circuit. As previously indicated, Dr. Johnson concurred in the need for in-flight testing despite his different approach to development of a suitable control circuit.

63. Teledyne also introduced the Declaration of Donald Deaton, a Teledyne employee, with respect to alleged obviousness of the claimed invention. The Deaton Declaration references certain calculations which he made to graphically illustrate the operation of the circuit illustrated at Figure 10 of the Patent. Deaton then compared his graphical results with a reference book that correlates such response graphical characteristics with transfer functions and implementing circuitry. Deaton then found a reference curve that he deemed sufficiently similar to the graph representative of the operation of the patented circuit and ascertained that the cross-referenced transfer function and implementing circuitry were the same as that disclosed in the '368 Patent. He then concluded that the disclosed transfer and circuitry would therefore have been well known to one of ordinary skill in the art.

64. The principal difficulty with the Deaton Declaration is that it proceeds from an assumption of the present invention and does no more than assert that one of ordinary skill could derive the disclosed transfer function and implementing circuitry from a curve representative of the operation of the disclosed circuitry. Thus, the Deaton Declaration adds nothing to Teledyne's arguments regarding obviousness.

65. Teledyne Brown Engineering is the only division of Teledyne Industries shown to be engaged in the manufacture or sale of turbine air vent reeling machines and related equipment. Teledyne Brown Engineering employs approximately 2,500 employees, only one of whom has been shown to devote a substantial and ongoing effort to the development or sale of the RMK-35 or related equipment. Aside from the ongoing work for delivery of the two RMK-35s to the Japanese Air Force, Teledyne has not demonstrated that it has entered into any additional contracts for the delivery of the RMK-35 during the pendency of this action.

66. To date, Teledyne has manufactured and delivered at least two RMK-35 reeling machines to Yamada for the Japanese Air Force. The value of Teledyne's present contract with Yamada for supply of RMK-35s and related equipment for Japanese Air Force is approximately $2.5 million.

67. Teledyne is also currently engaged in efforts to market the RMK-35 and related equipment to the air forces of the governments of Korea and Saudi Arabia. The estimated value of the potential sale to the Korean Air Force is approximately $2.4 million. The potential value of the sale to the Saudi Air Force is approximately $5.4 million.

68. The business of Southwest was formed based on the purchase of assets, including proprietary rights in the RMK-35 from PDA Corporation. For those rights and other assets Southwest incurred obligations to PDA of approximately $3.2 million. Southwest continues to make payments on that obligation to date. Southwest employs approximately forty employees, all of which are involved in the sale of aerial gunnery target systems. That work force was reduced from sixty within approximately the past six months.

69. The entire business of Southwest is directed to the sale of aerial gunnery target systems, of which the turbine air vent reeling machine is a central component. The loss of the sale of even a single RMK-35 turbine air vent reeling machine would likely have a substantial and irreparable impact on the business of Southwest.

70. Teledyne has incurred significant costs in connection with its performance of the Yamada Purchase Order No. 889/304P11297GAA, and will in the opinion of the Court suffer significant loss of credibility with its customers if it is not able to complete such purchase order. This loss is difficult to quantify. However, any injury Southwest may suffer by the Court allowing Teledyne to complete such purchase order can be remedied by monetary damages if Southwest is successful at trial on the merits.

## CONCLUSIONS OF LAW

1. The Court has subject matter jurisdiction of this patent infringement case under 28 U.S.C. § 1338(a). Personal jurisdiction and venue are not contested.

2. Injunctions in patent cases are governed by 35 U.S.C. § 283, which reads:

> The several courts having jurisdiction of cases under this title may grant injunctions in accordance with principles of equity to prevent the violation of any rights secured by a patent, on such terms as the Court deems reasonable.

The referenced statute places the issuance of an injunction within the trial court's judicial discretion governed by situations and circumstances affecting that exercise thereof. *Roche Products v. Bolar Pharmaceutical Co.*, 733 F.2d 858, 865, 221 U.S.P.Q. 937, 942 (Fed.Cir.,1984), *cert. denied,* 469 U.S. 856, 105 S.Ct. 183, 83 L.Ed. 2d 117 (1984); *Datascope Corp. v. Kontron, Inc.*, 786 F.2d 398, 399 (Fed.Cir.1986).

3. The standard for issuing a preliminary injunction in a patent case is essentially the same as for other cases. *Atlas*

*Powder Co. v. Ireco Chemicals,* 773 F.2d 1230, 1233, 227 U.S.P.Q. 289, 292 (Fed.Cir. 1985). It has been repeatedly held that for the District Court to grant a preliminary injunction the moving party must show (1) a reasonable likelihood of success on the merits; (2) that the plaintiff does not have an adequate remedy at law or will be irreparably harmed pendente lite if the injunction does not issue; (3) the threat of injury to plaintiff outweighs the threatened harm an injunction may inflict upon the defendant; and (4) the granting of a preliminary injunction will not disserve the public interest. See *Roper Corp. v. Litton Systems, Inc.,* 757 F.2d 1266, 1269, 225 U.S.P.Q. 345, 346 (Fed.Cir.1985); *H.H. Robertson v. United Steel Deck, Inc.,* 820 F.2d 384, 387 (Fed.Cir.1987).

4. With respect to the above-enumerated factors, it is well established that equity requires that no single factor be solely dispositive but, rather, that "each be weighed and measured against the others and against the relief demand." *Roper, supra* 757 F.2d at 1269 n. 2, 225 U.S.P.Q. at 346 n. 2.

5. At trial, Southwest must prove infringement by a preponderance of the evidence. However, for purposes of this motion, Southwest need only establish "at least a reasonable likelihood of success" with respect to infringement. *Roper,* 757 F.2d at p. 1272 n. 5. Given Teledyne's admission of infringement and the evidence in the record, Southwest has clearly met that burden.

6. With respect to patent validity the question for this Court to address is whether Southwest has demonstrated a reasonable likelihood that Teledyne would fail to meet its burden at trial of proving by clear and convincing evidence that the '368 Patent was invalid. A patent is presumed to be valid. 35 U.S.C. § 282; *Roper,* 757 F.2d at 1270, 225 U.S.P.Q. at 347. "It remains valid until a challenger proves it was stillborn or had birth defects, or it is no longer viable as an enforceable right," absent action by the Patent and Trademark Office under the reexamination statutes 35 U.S.C. Chapter 30. *Id.* (foot-note omitted). Thus, although the burden is always on the movant to demonstrate entitlement to preliminary relief, such entitlement is determined in the context of the presumption of patent validity. *H.H. Robertson Co. v. United Steel Deck, Inc.,* 820 F.2d 384, 388, 2 U.S.P.Q.2d 1926, 1928 (Fed.Cir.1987) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

7. A prior judicial adjudication of validity is useful but not necessary to support issuance of a patent preliminary injunction. E.g., *Atlas Powder Co. v. Ireco Chemicals,* 773 F.2d 1230, 1233, 227 U.S.P.Q. 289, 292 (Fed.Cir.1985); *Augat, Inc. v. John Mezzalingua Associates, Inc.,* 642 F.Supp. 506, 508, 1 U.S.P.Q.2d 1912, 1914 (N.D.N.Y.,1986).

8. Southwest has met its burden of demonstrating that Teledyne will not likely be successful with respect to its allegations of patent invalidity.

9. Given the evidence that the commercial embodiment of the claimed invention, i.e., the RMK–35, was not in existence at the time Southwest entered into subcontract SC7059 with Teledyne and given the additional evidence that the RMK–35 control circuit, (i.e., to avoid undesirable seeking and surging) was not known to be useful to perform its intended function until flight testing in June 1984, this Court concludes and holds that the RMK–35 was not sufficiently tested to demonstrate that it would work for its intended purpose until June of 1984 and further concludes and holds that there was no public use or sale of the invention more than one year prior to the date of the application for patent. 35 U.S.C. § 102(b); *Barmag Barmer Maschinenfabrik A.G. v. Murata Machinery Ltd.,* 731 F.2d 831, 221 U.S.P.Q. 561 (Fed.Cir.1984); *U.M.C. Electronics v. United States,* 816 F.2d 647 (Fed.Cir.1987).

10. Given the lack of any public dissemination of information regarding the RMK–35, this Court further concludes and holds that the claimed invention was not described in any printed publication more

than one year preceding the patent application filing date. 35 U.S.C. § 102(b).

11. Accordingly, Southwest's activities in relation to the RMK–35 do not constitute prior art to the '368 Patent claims under 35 U.S.C. § 102.

12. The standard for determining obviousness of the claimed invention is set forth in *Graham v. John Deere, Co.*, 383 U.S. 1, 17, 86 S.Ct. 684, 693, 15 L.Ed.2d 545, 148 U.S.P.Q. 459, 467 (1966). In order to make a determination regarding obviousness "the scope and content of the prior art are to be determined; differences between the prior art and claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved."

13. A determination of whether a structure is or is not "obvious" requires cognizance of the properties of that structure and the problem which it solves, viewed in light of the teachings of the prior art. *In re Wright*, 848 F.2d 1216, 1219, 6 U.S.P.Q.2d 1959, 1961 (Fed.Cir.1988).

14. With respect to the cited art the pertinent differences between the subject matter of Claim 1 of the '368 Patent and the prior art relate to the claimed means for controlling the operation of the vent means to avoid undesirable surging and seeking speed response of the rotor about a desired rotational speed. Dependent Claims 2–5 of the '368 Patent provide further distinctions between the prior art and the inventions defined in each of those claims.

15. Teledyne has acknowledged or at least has presented the testimony of an expert witness who testified that one of ordinary skill in the art at the time of the invention would be that of an individual having a bachelors of science degree in electrical or mechanical engineering with two courses in control systems and little or no experience with respect to ram air reeling machines.

16. Based on the present evidentiary record the Court concludes and holds that the differences between the invention of Claims 1–5 of the '368 Patent and the referenced prior art would not have been obvious to one of ordinary skill in the art at the time the invention was made.

17. More specifically, the claimed invention (subject of '368 Patent) was not an obvious modification over the RM–60 or RM–30 reeling machines previously sold by Southwest and its predecessor PDA.

18. Teledyne's arguments regarding alleged inequitable conduct are unconvincing and unpersuasive. With respect to nondisclosure of the RM–60 or the RM–30 to the United States Patent and Trademark Office this Court concurs with the determination of the Assistant Commissioner that such nondisclosure does not establish any inequitable conduct on the part of the applicants. Moreover, the record fails to evidence any intent on the part of the applicants to withhold any material information from the Patent Examiner.

19. In view of this Court's finding and conclusion that Southwest's activities with respect to the RMK–35 are not prior art to the '368 Patent, the lack of any disclosure of the RM–60 or RM–30 reeling machines which had been on sale prior to March 12, 1984 during the prosecution of the '368 Patent does not constitute inequitable conduct before the Patent and Trademark Office.

20. In further view of this Court's finding and conclusion that neither the RM–60 nor the RM–30 reeling machines which had been on sale prior to March 12, 1984 constitute inequitable conduct before the Patent and Trademark Office.

21. In further view of this Court's finding and conclusion that neither the RM–60 nor the RM–30 is prior art to the '368 Patent, the error made by or for Southwest in the '368 file history regarding the conception date of the RMK–35 control circuit was not material to validity of the '368 Patent and does not establish inequitable conduct in the prosecution of the '368 Patent.

22. Accordingly, Southwest has made a clear and strong showing that it will likely succeed in its claim that the '368 Patent is valid, has been infringed by Teledyne and that a finding of probable future infringe-

ment by Teledyne is justified. The Court here notes that the extent of infringement relates to damages and is a question to be determined at the trial on the merits, *Smith International, Inc. v. Hughes Tool Co.*, 718 F.2d 1573, 1581 (Fed.Cir.1983).

23. Given this finding and determination that the '368 Patent is valid and infringed by Teledyne and that a finding of probable future infringement by Teledyne is justified, a presumption of irreparable harm to Southwest is proper. *Smith International, Inc. v. Hughes Tool Co.*, 718 F.2d 1573, 1581, 219 U.S.P.Q. 686, 692 (Fed. Cir.1983), *cert. denied*, 464 U.S. 996, 104 S.Ct. 493, 78 L.Ed.2d 687 (1983); *H.H. Robertson Company v. United Steel Deck, Inc.*, 820 F.2d 384, 390, 2 U.S.P.Q.2d 1926 (Fed.Cir.1987); *Roper Corporation v. Litton Systems, Inc.*, 757 F.2d 1266, 1271–72, 225 U.S.P.Q. 345, 349 (Fed.Cir.1985).

24. The factual evidence of irreparable injury presented by Southwest further supports the presumption of irreparable harm arising from Southwest's strong likelihood of success on the merits.

25. This Court further concludes and holds that the balance of hardships in this case tips decidedly in favor of Southwest. It is apparent that Teledyne has undertaken a deliberate pattern of manufacturing and marketing products designed by Southwest with full knowledge of Southwest's claims of proprietary rights and of Southwest's pending patent application. Thus it is clear that Teledyne has proceeded at its own risk to market its version of the RMK–35 and in so doing has substantially infringed Southwest's patent rights.

26. Patent cases involve two competing public policy considerations. On one hand courts recognize the policy of protecting patent rights. *Smith International, Inc. v. Hughes Tool Co.*, 718 F.2d 1573, 1581, 219 U.S.P.Q. 686, 692 (Fed.Cir.), *cert. denied*, 464 U.S. 996, 104 S.Ct. 493, 78 L.Ed. 2d 687 (1983). On the other hand, public policy also favors free competition. See, e.g., *Smith International, supra; Datascope Corp. v. Kontron, Inc.*, 786 F.2d 398, 229 U.S.P.Q. 41, 42 (Fed.Cir.1986).

27. In view of the evidence that Teledyne deliberately copied the claimed invention developed by Southwest the Court finds that, at this stage, the public policy of protecting patent rights is more strongly implicated here such that Southwest should be able to prevent Teledyne from selling what Teledyne admits are copies of Southwest's turbine air vent reeling containing the '368 Patent art. *Toro Co. v. Textron, Inc.*, 5 U.S.P.Q.2d 1616, 1618, 703 F.Supp. 417 (W.D.N.C.1987). The Court therefore finds that public policy weighs in favor of granting Preliminary Injunction in this case.

28. In summary, the Court concludes and holds on the basis of the relevant facts and applicable law that Southwest has demonstrated its entitlement to the preliminary injunction prayed for on its claim of patent infringement and probable future patent infringement by Teledyne; provided, however, the Court will not enjoin Teledyne from completing its Yamada Purchase Order No. 889/304P11–297GAA dated January 28, 1988 for the reasons previously stated.

A Preliminary Injunction will forthwith issue as prayed for herein by Southwest with the exception above noted and with condition that Southwest give security in this case in amount of $100,000.00 in form of corporate surety bond approved by the Clerk of the Court for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained, pursuant to the requirements of Rule 65(c), Fed.R.Civ.P.