**MOORE U.S.A. INC., and Toppan Forms Co., Ltd., Plaintiffs,**

v.

**THE STANDARD REGISTER COMPANY, Defendant.**

No. 98–CV–485C(F).

United States District Court, W.D. New York.

Jan. 30, 2001.

Nixon & Vanderhye P.C. (Robert A. Vanderhye, James D. Berquist, of Counsel), Arlington, VA, Cohen Swados Wright Hanifin Bradford & Brett (Laurence B. Oppenheimer, of Counsel), Buffalo, NY, for Plaintiffs.

Oblon, Spivak, McClelland, Maier & Neustadt, P.C. (Charles L. Gholz, of Counsel), Arlington, VA, Gibson, McAskill & Crosby (Brian P. Crosby, of Counsel), Buffalo, NY, for Defendants.

## INTRODUCTION

CURTIN, District Judge.

Here, the court discusses two of the four motions currently before the court in this patent infringement action: (1) defendant Standard Register Company's ("SRC") motion for summary judgment on the issue of whether it has infringed United States Patent Number 5,201,464 ("the '464 patent"), Item 177; and (2) plaintiff Moore North America, Inc.'s ("Moore NA") cross-motion for summary judgment on the issue of whether SRC has infringed claim 1 of the '464 patent, Item 124.

## BACKGROUND

In layman's terms, the '464 patent covers a certain kind of "two-way C–Fold mailer." However, the term "two-way C–Fold mailer" is generic; not all C–Fold mailers are covered by the '464 patent. Obviously, Moore NA believes that *its* two-way C–Fold mailer—the '464 mailer—is the best two-way C–Fold mailer available on the market. Two-way C–Fold mailers enable the sender of mail to combine outgoing mail (*e.g.,* a bill for services or goods) with a detachable receipt or stub and a pre-addressed envelope that the recipient conveniently uses to respond to the mailing. Two-way C–Fold mailers have become commonplace throughout the business world, with many businesses using them to bill their customers. *See* Item 142, pp. 1–2. For this reason, the court often refers to Moore NA's patented C–Fold mailer as "the '464 mailer."

Moore NA accuses SRC of infringing the '464 patent by making and using a two-way C–Fold mailer that this court has referred to as "Form # 2." *See* Item 71, p. 2.[1] Here, the court refers to Form # 2 as "the accused form."

---

1. SRC's "Form # 1," which was the subject of litigation before the Eastern District of Virginia, is not at issue here.

## FACTS

### I. SRC's Entry into Product Market

In 1993, SRC began to research two-way C–Fold mailers—both the technology involved and the demand for them in the United States. *See* Item 142, p. 3. After some preliminary investigations, SRC decided to enter the U.S. market for two-way C–Fold mailers. Soon thereafter, SRC bought a "forms making machine" from a Swiss company called Hunkeler ("the Hunkeler machine"). The Hunkeler machine, which had been made in Switzerland, was designed to "assemble" two-way C–Fold mailers. Item 178, Exh. 2, 4 & 5.[2] In the fall of 1993, representatives from SRC traveled to Switzerland to learn how to use the Hunkeler machine. *Id.* When it traveled to Switzerland, the SRC team took the paper, pressure seal adhesive, and the blueprints that it needed to make the forms that would be used to test the Hunkeler machine. *See* Item 192, p. 6. While in Switzerland, the SRC team manufactured approximately 10,000 of the accused forms (Form # 2). *Id.* ¶ 6. The SRC team later returned to the United States in the fall of 1993 and brought most of these 10,000 accused forms with them. *Id.* ¶ 7. SRC sales representatives then used these accused forms for demonstration purposes at a 1993 trade show in Denver, Colorado. Item 178, Exh. 2, ¶ 7; *see also* Item 142, pp. 3–4.

David Washburn, the Technical Director of Production Equipment Development for SRC, states: "To the best of my knowl-edge . . . none of the [accused] Image Seal forms that [SRC] produced on the Hunkeler machine prior to the summer of 1994 was sold." Item 178, Exh. 2, ¶ 11. Furthermore, Washburn states that the accused forms were all "experimental" and "were simply thrown away after they were evaluated." *Id.* ¶ 13.

### II. Claim 1 of the '464 Patent and the Accused Form

In its motion for partial summary judgment, Moore NA offers a detailed explanation of how the accused forms "read on," or literally infringe, the '464 mailer. *See* Item 142, pp. 7–8 and Exhs. A–C. Moore NA has also carefully explained what is claimed in claim 1 of the '464 patent. A review of Moore's explanation and a careful reading of claim 1 reveal that the '464 mailer is characterized by:

perforated lines that are parallel to and adjacent to the "longitudinal" edges of the '464 mailer;

two strips of adhesive, which are placed on the back-face's margins [3] and which extend along the majority of those margins;

two more strips of adhesive that run parallel to the first two strips and are also on the mailer's back-face. However, these third and fourth strips are placed on *the other* side of the perforated lines than the first two strips are. These third and fourth strips also extend "a distance substantially less than

---

2. Pressure seal technology involves a kind of adhesive that is neither tacky to the touch nor sticky when wet. Rather, only carefully applied pressure will cause pressure seal adhesive to form a bond. Therefore, when pressure seal technology is used on a two-way C–Fold mailer, a special machine, like the Hunkeler machine, must be used to fold and "pressure seal" the mailer's adhesive edges.

3. By way of explanation, the "longitudinal margins" are the areas between the both mailers' longitudinal edges and longitudinal "lines of weakness." This formation allows the sender to seal the mailer shut and allows the recipient to open the mailer by tearing along the perforated edges of the mailer. *See* Item 142, Exhs. B and C.

the extent of [the] first and second strips" of adhesive; and finally

two more strips of adhesive that are placed in the front-face's "longitudinal" margins.

See Item 142, Exh. A, B, and C.[4]

## DISCUSSION

■■■ Generally speaking, "[a]n infringement analysis entails two steps. The first step is determining the meaning and scope of the patent claims asserted to be infringed. The second step is comparing the properly construed claims to the device accused of infringing." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed.Cir.1995). Courts may resolve issues of claim construction in the context of a summary judgment motion, since claim construction is a matter of law. *See Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 376–78, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996).

In the first step of the infringement analysis, courts may rely on three sources of evidence in order to construe the claim: "the claims themselves and the ordinary and accustomed meaning of the words employed, the written description of the specification (which describes one or more embodiments of the invention in sufficient detail to enable one of ordinary skill in the art to make and use the invention), and the patent's prosecution history." Item 142, p. 6 (citing *Markman*, 52 F.3d at 979).

"In the second step of the infringement analysis, the trier of fact determines whether the claims as construed by the Court 'read on' (or cover) the accused device . . . ." Item 142, p. 6 (citing *Markman*, 52 F.3d at 976).

■■■ Here, the issue of whether the '464 patent has been infringed may be resolved as a matter of law since there is no viable dispute over the claim's language, nor is

4. Claim 1 provides:

1. [A] mailer type business form intermediate, comprising:

a sheet of paper having a first face, adapted to provide the majority of the interior of the mailer when constructed, and a second face, adapted to provide the majority of the exterior of the mailer when constructed; said sheet having first and second opposite, parallel longitudinal edges extending the entire length thereof, and opposite ends; first and second longitudinal lines of weakness formed in said sheet parallel to and adjacent, but spaced from, said first and second longitudinal edges, respectively, said lines of weakness defining, with the longitudinal edges, longitudinal marginal portions;

first and second longitudinal strips of adhesive disposed in said first and second longitudinal marginal portions, respectively, of said first face, extending the majority of the lengths of the longitudinal marginal portions, and parallel to said first and second longitudinal edges;

third and fourth longitudinal strips of adhesive disposed parallel to said first and second strips, and disposed adjacent said first and second lines of weakness on the opposite side thereof from said first and second strips, on said first face, said third and fourth longitudinal strips disposed closer to one end of said ends than the other, and extending a distance substantially less than the extent of said first and second strips; fifth and sixth longitudinal strips of adhesive parallel to said first and second longitudinal edges and disposed in said first and second marginal portions, respectively, on said second face, said fifth and sixth strips located adjacent the same end of said sheet as said third and fourth strips, and having a longitudinal extent at the most equal to said and fourth strips;

means defining a transverse adhesive strip on said first face, perpendicular to said third and fourth strips, longitudinally spaced from said third and fourth strips; and

means defining a line of weakness adjacent said transverse strip, on the opposite side thereof from said third and fourth strips, to allow ready separation of the paper at that line.

U.S. Pat. 5,201,464, Title: Pressure Seal C–Fold Two–Way Mailer, Issue Date: 4–13–93.

there a dispute over the structure of the accused form. *See, e.g., Celotex v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (reciting standard of review in motion for summary judgment). Although SRC does dispute whether the language of claim 1 is sufficiently explained and defined, the court finds otherwise. *See infra* Discussion, Part I. Later, the court will also take up SRC's defense that it never made commercial use of the accused form and therefore cannot be found liable for infringement. *See infra* Discussion, Part II.

### I. Claim 1 of the '464 Patent and the Accused Form

■ The court's construction of claim 1, *see supra* Facts Part II, and its assessment of the accused form reveal that the accused form reads on claim 1 of the '464 patent. That is, the accused form's construction and design are virtually indistinguishable from the "embodiments" that were included within the '464 patent itself.

More specifically, both the '464 mailer and the accused form have perforated lines parallel to and adjacent to the mailer's edges; two strips of adhesive placed on the back face's margins and extending along the majority of those margins; two more strips of adhesive running parallel to the first two strips but on the other side of the perforated lines than the first two strips and extending "a distance substantially less than the extent of [the] first and second strips" of adhesive; and finally two more strips of adhesive placed on the front face's margins. *Compare* Item 142, Exh. A Figures 1 and 2 *with id.* Exh. B.

Put simply, the '464 mailer and the accused form are essentially identical in every material way-both in how they are laid out and configured. Thus, "every limitation recited in ... the claim appear[s] in the accused [form], *i.e.,* ... the properly

construed claim reads on the accused device exactly." *Cortland Line Co., Inc. v. Orvis Co., Inc.,* 203 F.3d 1351, 1358 (Fed. Cir.2000).

SRC does *not* expressly deny that the accused form reads on claim 1 of the '464 patent. Instead, SRC argues that this court must first require Moore NA to construe and define claim 1 before granting Moore NA relief. SRC insists that Moore NA has failed to proffer a construction for many of claim 1's ambiguous terms. Further, SRC insists that Moore NA must construe and define claim 1 *without referring at all to the accused form. See* Item 171, pp. 5–6 (citing *Scripps Clinic & Research Foundation v. Genentech, Inc.,* 927 F.2d 1565 (Fed.Cir.1991)).

The court rejects SRC's argument on this point. Although the language of claim 1 is somewhat technical and does not make for light reading, the plain meaning of the claim becomes apparent after a careful review of the language and the embodiments. *See supra* Facts, Part II (construing claim 1 and what kind of C–Fold mailer it describes). Therefore, no further claim construction is necessary in the context of Moore's present motion for partial summary judgment.

For reasons stated *supra,* then, the accused form reads on claim 1 of the '464 patent. However, a separate question is presented regarding whether SRC *infringed* the '464 patent by making, using, and testing the accused form with a commercial purpose. *See infra* Discussion, Part II.

### II. Infringement of the '464 Patent: "Commercial" Purpose of Accused Forms

In this case, the court has found that the accused form reads on the '464 patent's first claim. *See supra.* Such a finding

typically amounts to a finding of infringement, and the court's inquiry is at an end. However, SRC argues that it could not have possibly infringed the '464 patent because: (i) it used the accused forms strictly for experimental purposes, never for commercial purposes, and (ii) it made and used the accused forms in Switzerland, not here in the United States.

SRC's argument raises several issues of law: .(A) whether under 35 U.S.C. § 271(f)(1), SRC infringed claim 1 of the '464 patent through its 1993 manufacturing activities in Switzerland; (B) whether SRC can claim the protection of the experimental use or *de minimis* use doctrines; and (C) whether SRC used, sold, or tried to sell the accused forms in such a way as to compel a finding that SRC infringed claim 1 of the '464 patent.

### A. *35 U.S.C. § 271(f)(1)*

SRC contends that there can be no finding of infringement of the '464 patent because SRC made and used the accused forms in Switzerland, not here in the United States. First, the Patent Act generally extends only to infringing activities that take place within this country's borders. *See* 35 U.S.C. § 271(a).[5] On the other hand, Moore NA contends that SRC's activities in Switzerland *do* give rise to infringement liability because in certain cases, such as this one, the Patent Act extends infringement liability for actions that ultimately take place outside the United States. Here, Moore NA relies on section 271(f)(1), which provides:

> Whoever without authority supplies or causes to be supplied in or from the United States all or a substantial portion of the components of a patented invention, where such components are uncombined in whole or in part, in such manner as to actively induce the combination of such components outside of the United States in a manner that would infringe the patent if such combination occurred within the United States, shall be liable as an infringer.

35 U.S.C. § 271(f)(1). In short, Moore NA contends that SRC cannot evade infringement liability by arguing that it brought the necessary paper, glue, and blueprints from the United States to Switzerland and assembled the accused forms there rather than here in the United States.

### 1. *"Actively Induce."*

■ The primary dispute here arises from section 271(f)(1)'s phrase "actively induce." Moore NA contends that this language was intended to *expand* the basis of liability, not limit it, and that 271(f)(1) must extend to defendants who induce third-parties to assemble an infringing product outside the United States, *as well as to* parties that assemble infringing products outside the United States without the aid of a third-party. SRC responds by arguing that section 271(f)(1) is inapplicable to this case because SRC could not have "induced itself" to infringe the '464

---

**5.** Although section 271(a) also extends infringement liability to those who "offer to sell ... or import[ ] into the United States any patented invention," those particular provisions did not take effect until January 1, 1996. *See* 108 Stat. 4809, 4988–4990, Pub. Law 103–465, §§ 533–534 (Dec. 8, 1994) (indicating that the patent provisions did not become effective until one year after the date on which the World Trade Organization Agreement enters into force with respect to the United States); *and* Presidential Proclamation No. 6780, 60 Fed.Reg. 15845 (Mar. 27, 1995) (clarifying that the WTO Agreement entered into force for the United States on January 1, 1995). In this case, SRC's activities relating to the accused forms took place between the fall of 1993 and midway·through 1994. Thus, SRC's mere offer to sell or importation of the accused forms (from Switzerland) will not, when taken alone, give rise to infringement liability.

patent by assembling the accused forms in Switzerland.

Moore NA relies on a district court case entitled *T.D. Williamson, Inc. v. Laymon,* 723 F.Supp. 587 (N.D.Okla.1989), *aff'd* 923 F.2d 871, 1990 WL 191729 (Fed.Cir.1990) (Table Case, Text in Westlaw only).[6] In *Williamson,* the defendants vainly argued that they were exempt from infringement liability because they had assembled the infringing products in Venezuela, not in the United States. Looking to section 271(f)(1)'s legislative history, the court there reasoned at length:

> Defendants pin their argument for precluding the application of § 271(f)(1) to EPS' Venezuelan jobs upon the term "actively induce" in that subsection. Defendants reason that EPS escapes liability under that section because it did not "actively induce" some third party to combine the sensory fingers with the infringing pig body; according to defendants, they cannot "actively induce" themselves to combine the fingers with the infringing pig body. Defendants point to the legislative history of § 271(f) that states that the term "actively induce" was drawn from § 271(b), which provides that whoever actively induces patent infringement is liable as an infringer. However, defendants ignore the preceding sentence in the legislative history, which states that
>
> > [i]n order to be liable as an infringer under paragraph (f)(1), one must supply or cause to be supplied "all or a substantial portion" of the components in a manner that would infringe the patent if such a combination occurred within the United States.

Patent Law Amendments, Pub.L. No. 99–68, 1985 U.S.Code Cong. & Admin. News (98 Stat.) at 5828.

The legislative history noted that § 271(f) was intended to prevent copiers from avoiding U.S. patents by supplying components of a patented product in this country so that the assembly of the components may be completed abroad. *Id.* This section of the patent law amendment was proposed in response to the U.S. Supreme Court's decision in *Deepsouth Packing Co. v. Laitram Corp.,* 406 U.S. 518, 92 S.Ct. 1700, 32 L.Ed.2d 273 (1972), which created a loophole in prior patent law, allowing copiers to avoid liability for products patented in the United States, by shipping the patented components for combination in foreign countries.

Defendants' claim of required "active inducement" for liability under § 271(f)(1) is not supported by that subsection's legislative history. It is unreasonable that Congress, in attempting to close the loophole for infringement created by the *Deepsouth* decision, would create another loophole allowing infringers to eschew dealing with foreign parties in order to avoid liability for "active inducement," as defendants now claim. Rather than a limiting factor for liability under § 271(f)(1), the legislative history suggests the phrase, "actively induce" was intended to broaden the basis for liability, extending it to cover both those who actually supply the components as well as those (contributory infringers) who cause others to supply components. *Williamson,* 723 F.Supp. at 591–92. Clearly, *Williamson* stands exactly for the

---

**6.** Moore NA also cites to *Wahpeton Canvas Co. v. Bremer,* 893 F.Supp. 863, 872–74 (N.D.Iowa 1995). However, that case is of little help to the present inquiry since the *Wahpeton* court hardly discussed section 271(f) at all in its analysis. As a result, *Wahpeton* does not shed light on section 271(f)(1)'s "actively induce" clause, which is at issue here. *See id.*

proposition that Moore argues here: SRC can be liable under section 271(f)(1) even if SRC did not induce a third-party to assemble the infringing product.

SRC urges this court to reject *Williamson*. First, SRC insists that the *Williamson* court wrongly read the "inducement" language out of section 271(f)(1) and interposed itself as a "surrogate legislature." Item 192, p. 5. Further, SRC cites *Chisum on Patents* and observes that the treatise's authors imply that *Williamson* is "against the weight of authority." Item 192, p. 4 & n. 9. Having made such an argument, though, SRC fails to cite even one case from this alleged "weight of authority." This court's research failed to produce any other cases, besides *Williamson*, speaking directly to this novel issue.

The court finds that *Williamson*'s facts are substantially on point with the present action. That is, SRC's representatives brought supplies (paper, glue, and blueprints) from the United States so that the accused forms could be assembled in Switzerland. Further, like the defendant in *Williamson*, SRC seeks to evade the effect of section 271(f)(1) by arguing that there was no third-party involved and that SRC could not have "induced" itself to infringe the '464 patent. *See* Item 192, pp. 4–5.

*Williamson* also provides a persuasive reading of section 271(f)(1). By looking to Congress' clear intent to close a loophole created by the Supreme Court's decision in *Deepsouth*, the *Williamson* court reached a carefully reasoned decision. In addition, *Williamson* was both affirmed by the Federal Circuit and, as stated *supra*, appears to be the only case that discusses section 271(f)(1)'s "active inducement" clause in any detail. Finally, *Rothschild v. Ford Motor Co.*, 2 F.Supp.2d 941 (E.D.Mich. 1998), which is one of the only other cases that alludes to the "inducement" ambiguity in section 271(f)(1), cites favorably to the *Williamson* court's ruling. *See Rothschild*, 2 F.Supp.2d at 946–47.

Taken together, section 271(f)(1)'s legislative history and *Williamson* tend to demonstrate that 271(f)(1) extends infringement liability to parties that supply "all or a substantial portion of the components of a patented invention" for assembly outside the United States *regardless* of whether that party enlisted the aid of a third-party. Thus, section 271(f)(1) regulates SRC's manufacture and use of the accused forms in Switzerland.

### 2. *"All or a Substantial Portion" of the Accused Forms' Components.*

■ Next, the court must resolve whether under section 271(f)(1) SRC "supplied ... from the United States all or a substantial portion of the [accused forms'] components." SRC argues that it did not supply "substantially all" of the accused forms' components because the SRC representatives brought the paper and glue from the United States, but not the accused forms' "perforated portions." Item 192, p. 6.

Moore NA decries what it calls a "metaphysical absurdity" in SRC's argument, *i.e.*, the idea that holes in paper are a "component" that SRC might have exported. Item 202, p. 3. Moreover, Moore NA takes issue with SRC's bending of section 271(f)(1)'s language. Indeed, section 271(f)(1) speaks of a defendant supplying "a substantial portion" of the infringing product's components, *not*, as SRC suggests, "substantially all" of the infringing product's components. *Id.*

Thus, under section 271(f)(1), SRC representatives supplied "a substantial portion" of the accused forms' components when they brought the necessary paper, glue, and blueprints with them from the United States.

3. *"In a Manner that Would Infringe the Patent ... Within the United States."*

Finally, there is the issue of whether SRC supplied components so that the accused forms could be combined in Switzerland "in a manner that would infringe the patent if such combination occurred within the United States...." 35 U.S.C. § 271(f)(1). For reasons discussed *infra* in Parts II, B & C of the Discussion, the court finds that SRC's manufacture and use of the accused forms did constitute an infringement, since such activities were unlicensed and performed "with a view" towards commercial development of the accused forms. *See Roche Products, Inc. v. Bolar Pharmaceutical Co., Inc.*, 733 F.2d 858, 863 (Fed.Cir.1984) (finding that "unlicensed experiments conducted with a view to the adaption of the patented invention to the experimentor's business is a violation of the rights of the patentee to exclude others from using his patented invention").

In light of the foregoing, the court finds that SRC did infringe claim 1 of the '464 patent when its representatives brought paper, glue, and blueprints from the United States, used those components to assemble the accused forms in Switzerland, and then tested the accused forms on the Hunkeler machine.

### B. *Experimental or De Minimis Use*

█ In denying that it has infringed claim 1 of the '464 patent, SRC seeks the safe harbor of the experimental use and/or the *de minimis* use exemptions.

The Second Circuit has explained the experimental use exemption in the following way: "[N]ot every unauthorized construction of a patented article constitutes an infringement.... [Indeed,] [t]he use of the patented machine for experiments for the sole purpose of gratifying a philosoph-ical taste or curiosity or for instruction and amusement does not constitute an infringing use." *Kaz Mfg. Co. v. Chesebrough–Ponds, Inc.*, 317 F.2d 679, 680 (2d Cir. 1963) (quoting *Ruth v. Stearns–Roger Mfg. Co.*, 13 F.Supp. 697, 713 (D.Colo.1935), *rev'd on other grounds*, 87 F.2d 35 (10th Cir.1936)). More recently, the Federal Circuit clarified the distinction between experimental use and commercial use: "Tests, demonstrations, and experiments * * * [which] are in keeping with the legitimate business of the * * * [alleged infringer]" are infringements for which "[e]xperimental use is not a defense." *Roche Products, Inc. v. Bolar Pharmaceutical Co., Inc.*, 733 F.2d 858, 863 (Fed.Cir. 1984) (quoting *Pitcairn v. United States*, 212 Ct.Cl. 168, 547 F.2d 1106 (1976)). Finally, the Ninth Circuit offered the following guidance on the issue of experimental use:

> Just as the manufacture of one machine by an infringer is sufficient to make the manufacturer liable, regardless of use or sale, so one sale is sufficient.
>
> The mere manufacture of a patented article, without sale, is sufficient to create an infringement.
>
> And even the threat to use patented subject matter may give a right to a cause of action.

*Neff Instrument Corp. v. Cohu Electronics, Inc.*, 269 F.2d 668, 673 (9th Cir.1959) (citations omitted).

In the present case, an SRC representative has admitted that he, along with several other SRC employees, took the necessary paper, glue, and blueprints to Switzerland so that they could make approximately 10,000 accused forms and then test the forms and the Hunkeler machine. SRC also avers that none of the accused forms were ever sold or actually offered for sale.

By making this argument, however, SRC necessarily, and curiously, implies that it was non-commercial for it to make and use the accused forms as a means of testing the Hunkeler machine. This argument invites at least two questions. First: Did SRC make and use the accused forms in order to test both the forms and the Hunkeler machine, or did SRC intend to test the machine only? And: Did SRC make and use the accused forms in order to evaluate the Hunkeler machine simply out of idle curiosity or a purely philosophical interest, or did SRC act with an eye towards its business interests? The answers to these questions are obvious, and they compel the conclusion that SRC is not entitled to the experimental use or *de minimis* use exemptions.

SRC attempts to liken this case to *Ruth v. Stearns–Roger Mfg. Co.*, 13 F.Supp. 697 (D.Colo.1935), *rev'd on other grounds*, 87 F.2d 35 (10th Cir.1936). In *Ruth*, the court exempted certain machine parts from infringement on the basis of the experimental use doctrine because the Colorado School of Mines had bought the infringing parts. Both the infringing machines and parts "were all used in the laboratory and were ... changed from day to day.'" Item 178, pp. 3–4 (quoting *Ruth*, 13 F.Supp. at 703). Yet, the cited section of *Ruth* is inapposite for several reasons. First, the court there was inquiring into the defendant's "contributory infringement."[7] The court found that the defendant had committed no contributory infringement when it sold "covered," or infringing, machine parts to a college that used the parts as replacements on "covered" machines. Furthermore, the court relied on the fact that the college was using the infringing machines and infringing parts for experimental purposes only. *Id.* at 703–04. Here, there are no similar factual considerations.

Moreover, this case differs critically from *Ruth* because SRC is not an educational institution, nor did SRC make the accused forms so that it could sell them to an educational institution. *See* Item 181, pp. 3–4.

This court's decision as to experimental use is also informed by the Federal Circuit's recent decision in *Embrex, Inc. v. Service Engineering Corp.*, 216 F.3d 1343 (Fed.Cir.2000). In that case, plaintiff Embrex was the exclusive licensee of a patented method "for inoculating birds against disease by injecting vaccines into a specified region of the egg before hatching." 216 F.3d at 1346. Defendant SEC appropriated this patented method and built its own inoculating machine. *Id.* A jury ultimately found that SEC had infringed the patent and returned a verdict in favor of Embrex. *Id.* at 1347. On appeal, the Federal Circuit affirmed the trial court's refusal to set aside the jury's verdict. In ruling, the court reiterated that the experimental use exemption (and the *de minimis* use exemption, for that matter) was an exceptionally narrow defense, which is available only where "infringement [is] performed 'for amusement, to satisfy idle curiosity, or for strictly philosophical inquiry.'" 216 F.3d at 1349. Further, the court held that defendant SEC's "alleged experimental use" did not "fit within the narrow confines of the alleged experimental use exception because this particular use ... had 'definite, cognizable, and not

---

**7.** The relevant form of "contributory infringement" is now codified in 35 U.S.C. § 271(c):

> Whoever ... sells ... a material ... constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use, shall be liable as a contributory infringer.

insubstantial commercial purposes.' " *Id.* Thus, the Federal Circuit rejected the argument that SEC's investigation into the patented inoculation technology had been "experimental:"

> SEC's acts of hiring Drs. Davis and Rosenberger, and the doctors' acts injecting eggs with vaccine cannot be deemed experimental use or *de minimis.* While SEC tries to cloak these tests in the guise of scientific inquiry, that alone cannot immunize its acts. The district court determined on the record before it that SEC performed the tests expressly for commercial purposes. SEC's chief commercial purpose was to demonstrate to its potential customers the usefulness of the methods performed by its *in ovo* injection machines. Just because SEC was unsuccessful in selling its machines does not confer infringement immunity upon SEC for its infringing acts.

*Embrex,* 216 F.3d at 1349. Although the present case differs from *Embrex*'s procedural posture, the court's reasoning is helpful. Much like the defendant in *Embrex,* it is self-evident that SRC made and used the accused forms for the commercial purpose of testing and evaluating the forms themselves as well as the Hunkeler machine. SRC's employees did not travel to Switzerland in order to satisfy their own "idle curiosity." Indeed, if the accused forms had worked perfectly in the Hunkeler machine from the very beginning, SRC would have succeeded in making an infringing product that was ready for sale.

The court also looks again to the *Roche* decision. First, there is an interesting parallel between the arguments offered by the defendant in *Roche*—Bolar—and the defendant here—SRC. In *Roche,* the court found that Bolar's "intended use of [the patented product] does not fall within the 'traditional limits' of the experimental use exception" and that this was "fatal" to Bolar's attempt to assert the doctrine of experimental use. 733 F.2d at 863. In this case, SRC makes a similar concession: "The facts of the present case are quite different than those in most experimental use cases." Item 178, p. 5. Much like the court in *Roche,* this court is not inclined to expand the experimental use doctrine to cover unusual fact scenarios such as this one.

In addition, the following language from *Roche* is apt: "[T]ests, demonstrations, and experiments *which are in keeping with the legitimate business* of the alleged infringer *are infringements* for which experimental use is not a defense." 733 F.2d at 863 (citation and quotation omitted) (internal formatting omitted). As discussed *supra,* SRC's manufacture and use of the accused forms were "in keeping with [its] legitimate business," and its manufacture and use of those forms was, as a result, commercial, not experimental, in nature.

There is no reason for this court to reach a different conclusion on the issue of the *de minimis* use exemption. After all, the experimental use defense is just "an expression of the maxim *de minimis non curat lex.*"[8] *Douglas v. United States,* 181 U.S.P.Q. 170, 177, 1974 WL 20548 (Ct.Cl.1974), *aff'd* 206 Ct.Cl. 96, 510 F.2d 364 (1975). Indeed, courts have questioned whether "any infringing use can be de minimis." *Deuterium Corp. v. United States,* 19 Cl.Ct. 624, 631 (Cl.Ct.1990) ("Damages for an extremely small infringing use may be *de minimis,* but infringement is not a question of degree.").

Moreover, the *Embrex* court refused to exempt the defendants from liability based on *de minimis* use even though the defen-

---

**8.** "The law does not concern itself with trifles."

dants did nothing more than run tests on their infringing machines. Instead, the court in *Embrex* ruled that the defendants had "performed the tests expressly for commercial purposes." 216 F.3d at 1349. Adding: "Just because [defendant] SEC was unsuccessful in selling its machines does not confer infringement immunity upon SEC for its infringing acts." *Id.* Like the court in *Embrex*, this court finds that SRC tested the accused forms, as well as the Hunkeler machine, for commercial purposes. Therefore, the court refuses to exempt SRC from infringement liability based on a *de minimis* use exemption.

In light of the foregoing, SRC cannot maintain the experimental use exemption or the *de minimis* use defense as grounds for summary judgment or in opposition to Moore NA's motion for summary judgment. Therefore, SRC's motion for summary judgment is denied. The court will now take up whether Moore NA can prevail on its motion for partial summary judgment.

### C. *Other Evidence of SRC's Commercial Use of the Accused Forms*

In addition to the evidence and law discussed *supra* in Part II, B, Moore NA has offered various other items of evidence in an effort to show how SRC made and used the accused forms with an eye towards its business interests.[9] Here, the court briefly reviews this evidence and the parties' arguments relating to this evidence.

#### 1. *Display and Distribution of Accused Forms at a 1993 Trade Show.*

■ SRC representatives brought accused forms back to the United States from Switzerland and then used those forms as "sales tools" at a 1993 trade show

that took place in Denver, Colorado. *See* Item 175, p. 5 & Item 175, Exh. K, pp. 9–10, 13. However, courts have recognized that the mere demonstration of an infringing product at a trade show is not, in and of itself, an infringing act. *See, e.g., Intermedics, Inc. v. Ventritex, Inc.,* 775 F.Supp. 1269, 1285–86 (N.D.Cal.1991), *aff'd* 991 F.2d 808, 1993 WL 87405 (1993).

On the other hand, courts have also recognized that displaying an infringing product at a trade show *may contribute* to a finding that an infringing act has taken place. That is, "demonstration of an accused device does not constitute an act of infringement unless the 'totality of the circumstances' also reveals concurrent 'sales oriented' activity which results in, or at least substantially advances, an actual sale of the accused device." *Id.*

Furthermore, this case is somewhat different from *Intermedics* and others like it, *see e.g., Neff Instrument Corp. v. Cohu Elec. Inc.,* 269 F.2d 668, 672–73 (9th Cir. 1959), since SRC actually distributed the accused forms during the Denver trade show as part of a sales effort. *See* Item 175, Exh. J, p. 12 & Exh. K, pp. 9–10, 13.

In any event, SRC's use of the accused forms at the trade show does lend support to the court's previous finding that SRC made, used and tested the accused forms with "a view to the adaption of the patented invention to the experimentor's business." *Roche,* 733 F.2d at 863.

#### 2. *Alleged Sales of Accused Forms to Lexington Medical Center.*

Moore NA argues that an internal SRC memorandum, dated December 2, 1993, shows that SRC gave the Lexington Medical Center the equipment and training it

---

**9.** On the other hand, the record does not suggest that SRC sold many of the accused forms. Therefore, Moore NA's damages may be insubstantial to the extent that damages will be measured by SRC's sales of the accused forms.

would need to use the accused forms for its billing needs ("the Lexington memo"). *See* Item 175, p. 6 & Exh. M. The parties appear to agree that the Lexington memo does actually refer to the accused form when it references the sale of 10,000 C–Fold mailers to the Lexington Medical Center. However, SRC insists that the Lexington memo was "prospective" in nature and that SRC did not sell any C–Fold mailers to the Lexington Medical Center until 1995; by which time SRC was marketing its non-infringing "Form # 1." *See* Item 192, pp. 7–8 and Exh. 2, ¶ 9.

Yet, the Lexington memo reveals SRC's intent to market and commercialize the accused form: "Initial form systems to be converted to IMAGE SEAL are: 2 way mailer (statement) which will be designed as 8½ × 14 .... We *will* sell them the forms used for trial." Item 175, Exh. M (emphasis added). Presumably, the writer of the memo was referring to the Swiss trials. SRC argues that the Lexington memo does not demonstrate that SRC sold the accused forms to the Lexington Medical Center. Nevertheless, the Lexington memo does reveal an intent to sell the accused forms. Thus, the Lexington memo further contributes to the court's finding of infringement when it is viewed in a larger context of SRC's commercial intent.

### 3. *Alleged Sales of Accused Forms to Kyto Diagnostics.*

Moore NA argues that a letter from SRC salesman Michael Palen to Kyto Diagnostics ("Kyto") demonstrates that SRC induced Kyto to buy SRC's C–Fold mailers by promising to give Kyto 10,000 accused forms in February 1994 ("the Palen letter"). *See* Item 175, p. 6 & Exhs. N & P. The Palen letter states that SRC would

> provide 10M [10,000] forms per the same attached sample [*i.e.*, Item 175, Exh. N]

.... These samples will allow you to seal on the equipment and actually provide you with a live parallel test for your convenience. We would hope you would actually send them out to your customers so they can advise us of the pros and cons [of the accused forms] .... There would be no charge to Kyto for this test order.

Item 175, Exh. P. SRC responds by submitting an affidavit from Palen, in which the SRC salesman states that he did not place an order for Kyto's 10,000 C–Fold mailers until August 1994, by which time SRC was making and selling Form # 1, not the accused form. Item 192, Exh. 3, ¶¶ 7–8.

As with the Lexington Medical Center, the evidence relating to Kyto does not show an actual sale of the accused forms. Nevertheless, the Palen letter does reveal that SRC was offering its two-way C–Fold mailer to customers at a time when its C–Fold mailer was, in fact, the accused form. Thus, the Palen letter also contributes to a finding that SRC developed and manufactured the accused form with an intent to use or sell it commercially.

### 4. *Alleged Sales of Accused Forms to Gannett Direct Marketing.*

Moore NA also alleges that SRC sold 500,000 of the accused forms to Gannett Direct Marketing ("Gannett") and later secured an order from Gannett for 5,000,000 more of the accused forms. *See* Item 175, pp. 6–7 & Exh. R, pp. 06354–55, 06457, 06460. SRC responds by submitting an affidavit from SRC salesman Jerry Newell, who avers that SRC never actually landed an order from Gannett for any C–Fold mailers. Item 192, Exh. 4, § II.

However, Newell freely admits that he engaged in "protracted discussions" "in the first months of 1994" in an effort to sell two-way C–Fold mailers to Gannett. Item

192, Exh. 4, § II, ¶ VI. Thus, Newell admits that he aggressively sought out Gannett as a buyer of C–Fold mailers at a time when SRC only had the accused forms to offer for sale. While SRC's contact with Gannett is not evidence of infringement when it is considered alone, Newell's solicitations of and negotiations with Gannett—like Palen's solicitations of Kyto—contribute to the court's finding of infringement.[10]

## CONCLUSION

SRC cannot maintain the defense of either experimental use or *de minimis* use. Further, the accused form reads on Moore NA's '464 mailer. SRC also manufactured, used, and tested the accused forms with a view to their adaption to SRC's business. Therefore, the court denies SRC's motion for summary judgment on the '464 patent (Item 177) and grants Moore NA's motion for partial summary judgment on claim 1 of the '464 patent (Item 124).

So ordered.

---

**10.** In addition to the foregoing, Moore NA offers a number of other arguments relating to SRC's commercial use of the accused forms. *See* Item 175, p. 7 and Exhs. O, p. 1388 and Exh. T, p. 8676; Item 175, p. 7 and Exh. W, pp. 41–44; Item 175, p. 8 and Exh. Y, p. 14033. SRC argues effectively against all of Moore NA's remaining allegations. *See* Item 192, pp. 11–13 and Exh. 2, ¶¶ 6–8 and Exh. 3, ¶¶ 9–10. Not only is the evidence supporting these remaining allegations murky, but the court need not credit Moore NA's remaining allegations in order to find that SRC has infringed claim 1 of the '464 patent.